**Howard FULLER et al., Plaintiffs,**

**v.**

**Robert SCOTT, Governor of the State of North Carolina, et al., Defendants.**

**No. C-249-D-69.**

United States District Court, M. D. North Carolina, Durham Division.

Heard May 21, 1971.

Decided June 21, 1971.

---

W. G. Pearson, II, and C. C. Malone, Jr., of Pearson, Malone, Johnson & De-Jarmon, Durham, N. C., for plaintiffs.

Burley B. Mitchell, Jr., and Charles A. Lloyd, Raleigh, N. C., for defendants.

Before CRAVEN, Circuit Judge, and JONES and GORDON, District Judges.

PER CURIAM.

A divided Court (Jones, D. J., dissenting) on February 23, 1971, entered a declaratory judgment and opinion (see Appendix) in this case holding unconstitutional portions of Article 36A, Chapter

14 of the North Carolina General Statutes, entitled Riots and Civil Disorders (the Act). Injunctive relief was not awarded. Following the entry of the judgment and opinion in this case, opinions of the Supreme Court of the United States were distributed in the following cases:[1] Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

The defendants, on March 3, 1971, filed a motion, including a brief citing the foregoing decisions, to amend the judgment of February 23, 1971, and for stay of the judgment. The plaintiffs timely filed a response to the defendants' motion and a brief in support of the response. Even though the parties stipulated that the Court might decide the motion on briefs without oral argument, the Court deemed it advisable to have the parties present oral argument. The hearing on the motion was held on May 21, 1971.

It is against the background of Younger v. Harris, *supra,* and the other cases decided on the same day by the Supreme Court that we must now consider the defendants' motion to amend the judgment of this Court entered February 23, 1971. As stated in Fuller et al. v. Scott et al. (*See* Appendix), this Court was of the opinion that Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); and Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), reh. den. 391 U.S. 971, 88 S.Ct. 2029, 20 L.Ed.2d 887, gave full dimension to the concept of federal review of state penal statutes attacked on their face as abridging freedom of speech.

As we interpreted *Dombrowski, Zwickler* and *Cameron,* abstention was improper when (1) from the complaint it appeared that the state statute was facially so vague or overbroad that its application unduly hindered rights of free speech and the statute did not reasonably appear susceptible of a limiting state court construction, or (2) the state statute, though constitutional on its face, was alleged to have been applied arbitrarily or in bad faith in such manner as to accomplish the same result.

Upon considering the complaint, stipulations and contentions of the parties in the subject case, we arrived at the conclusion that certain sections of the statutes complained about were unconstitutionally vague and overbroad; that these sections involved first amendment rights; and that the questioned sections, in part, did not reasonably appear susceptible of a limiting state court construction. We refused to abstain or to consider the questions moot. The opinion and judgment more specifically develop the majority and minority views in this respect. *Younger* and the companion cases decided by the Court on February 23, 1971, as we interpret them, suggest a different result, that is, that abstention was demanded under the facts before us.

A major portion of the Court's opinion in *Younger,* written by Justice Black, deals with the comity doctrine and he admonishes that it is best to adhere to the concept that "the National Government will fare best if the states and their institutions are left free to perform their separate functions in their separate ways." Justice Black cites Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926), for language restricting the rule expressed in Ex Parte

1. By coincidence, the decision in each of these cases was entered by the Supreme Court on February 23, 1971, the date of the entry of the judgment and opinion in the subject case.

Young, 209 U.S. 123, 28 S.Ct. 441, 52 L. Ed. 714 (1908). He went on to say:

"In Fenner v. Boykin (cite omitted) suit had been brought in the Federal District Court seeking to enjoin state prosecutions under a recently enacted state law that allegedly interfered with the free flow of interstate commerce. The Court, in a unanimous opinion made clear that such a suit, even with respect to state criminal proceedings *not yet formally instituted,* could be proper only under very special circumstances:

"'Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, and following cases have established the doctrine that when absolutely necessary for the protection of constitutional rights courts of the United States have power to enjoin state officers from instituting criminal actions. But this may not be done except under extraordinary circumstances where the danger of irreparable loss is both great and immediate. Ordinarily, there should be no interference with such officers; primarily, they are charged with the duty of prosecuting offenders against the laws of the State and must decide when and how this is to be done. The accused should first set up and rely on his defense in the state courts, even though this involves a challenge to the validity of some statute, unless it plainly appears that this course would not afford adequate protection.' Id., at 243–244, 46 S.Ct. 493.

"These principles made clear in the *Fenner* case have been repeatedly followed and reaffirmed in other cases involving *threatened prosecutions.*" (cites omitted) 401 U.S. at 45–46, 91 S.Ct. 751. (Emphasis added.)

The opinion in *Younger* cites with approval the decision in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), but emphasizes that in *Dombrowski* there were substantial allegations and offers of proof of threats made without expectation of securing valid convictions, planned arrests and seizures to harrass the plaintiffs, the use at public meetings of photocopies of records illegally seized and threats to use other copies for obtaining grand jury indictments. Taking issue with the District Court's decision in *Younger*, enjoining further prosecution of Harris, Justice Black wrote:

"The District Court, however, thought that the *Dombrowski* decision substantially broadened the availability of injunctions against state criminal prosecutions and that under that decision the federal courts may give equitable relief, *without regard to any showing of bad faith or harassment, whenever a statute* is found 'on its face' to be vague or overly broad, in violation of the First Amendment." 401 U.S. at 50, 91 S.Ct. at 753. (Emphasis supplied)

■ He says that the broad statements in *Dombrowski* which seem to extend the rule were unnecessary to the decision in that case, and to the extent that the lower court relied upon those statements, it was in error. Thus, it appears that in addition to facial unconstitutionality of a statute, not susceptable of a limiting state court construction, involving fundamental constitutional rights, federal courts must abstain unless there is a showing of bad faith or harrassment. Further, there must be a showing that the enforcement of the statute will result in irreparable harm that is both great and immediate. A "chilling effect" on first amendment rights, referred to in *Dombrowski*, will not by itself justify intervention.

Our judgment of February 23, 1971, granted only declaratory relief. The complaint did, however, ask for injunctive relief. Samuels v. Mackell, *supra,* holds that interference with criminal prosecutions by declaratory judgments is subject to the same restrictions curbing federal interference by injunction.

Plaintiffs, Fuller, Greyson, and Behcler, were charged in warrants issued November 26, 1969, with violating §§ 14–

288.2, 14–288.4 and 14–288.5 of the Act in controversy. No warrant was issued for plaintiff Dobbins or Lee. Officials of the University of North Carolina, by complaint filed November 26, 1969, sought and secured injunctive relief in state court against all the plaintiffs in this suit and others. The injunctive relief in general prohibited the defendants therein named from disrupting the operation of the University. At the February 23, 1971, Term of the Superior Court of Orange County, a voluntary dismissal of the state court action awarding the injunctive relief was entered, and subsequently the criminal proceedings were resolved in favor of Fuller, Greyson, and Behcler.[2]

██ Neither by the evidence nor in argument of counsel is there any showing of a bad faith use of the Act or that it has been used in a threatening or harassing manner against these plaintiffs or anyone else. Indeed, a voluntary dismissal was taken in the state court suit for injunctive relief, which relief had been granted pursuant to § 14–288.1 of the Act. There is no evidence that any of the plaintiffs have been arrested or threatened since the charges on November 26, 1969, or for that matter prior to on or about November 26, 1969, when they were charged with violating the Act. If the plaintiffs had alleged that they had been prosecuted in bad faith under the Act or that through the provisions of the Act they had been subjected to harassment, and the Court could so find these allegations true, then there would be merit to their contentions. We find an insufficient showing in the record that the plaintiffs have suffered or will suffer irreparable harm that is "both great and immediate" if relief by this Court is not granted. Hence, we must vacate the judgment of February 23, 1971, and dismiss the action.

2. Paragraph 11 of the stipulations filed with the Court on September 23, 1971, recite that "all criminal proceedings against these plaintiffs resulted in verdicts of 'not guilty' or were otherwise terminated in their favor." It is unclear to the Court the exact manner in which these cases were terminated, but it is known that the strike which triggered the difficulty was over.

A judgment consistent with this opinion will be entered.

Before CRAVEN, Circuit Judge, and JONES and GORDON, District Judges.

## APPENDIX

### OPINION OF THE COURT

GORDON, District Judge.

#### FACTS

Pursuant to 28 U.S.C. § 2281, et seq., a three-judge court was convened to hear the plaintiffs attack upon the constitutionality of North Carolina General Statutes §§ 14–288.1 through 14–288.19, Riots and Civil Disorders. Jurisdiction is present under 28 U.S.C. § 1343(3), (4) and 42 U.S.C. § 1983.

The plaintiffs allege that parts of the Statute, commonly referred to as the "Riot Control Act," are vague, and overbroad, and have been applied toward them with bad faith, all in such a way as to offend the First Amendment guaranty of free speech and the due process clause of the Fourteenth Amendment. To this effect, they seek a declaratory judgment and injunctive relief.

At the hearing, stipulations of facts were presented in lieu of oral testimony. They reveal that early in November, 1969, a labor dispute arose between Saga Food Service, Inc., a food caterer under contract to provide dining services at the University of North Carolina at Chapel Hill, and certain of its hourly employees. A strike was called and picket lines were established near Chase and Lenoir Halls, which housed the two Saga facilities then remaining open. Picketing continued through November up until the time with which we are concerned here.

Affidavits reflect[1] that on November 25, 1969, a group of 25–35 Negroes,

1. The parties stipulated that affidavits might be treated as depositions, cross-examination being waived.

many wearing shirts inscribed with "Malcolm-X," arrived at Lenoir Hall and joined in the picketing. Inferentially, the plaintiffs or some of them were among this group. Later, after a period of peaceful picketing, a disturbance ensued. Plaintiffs Fuller, Graysen, and Behcler, who were affiliated neither with the University nor Saga were arrested and charged under §§ 14–288.2, 14–288.4 and 14–288.5 of the North Carolina General Statutes.[2] (See Appendix A)

On November 26, 1969, the defendants, William C. Friday, President of the Consolidated University of North Carolina, and J. Carlyle Sitterson, Chancellor of the University of North Carolina at Chapel Hill, filed an action in the General Court of Justice, Superior Court Division, Orange County, seeking to enjoin these plaintiffs, one George Vlasits, and "Doe One to Doe Five Hundred"—being unnamed persons similarly situated to those persons named—from coming onto the Chapel Hill campus. Application for injunctive relief was made pursuant to G.S. 14–288.18. Later that day, the late Judge Leo Carr granted a preliminary injunction *ex parte* without notice to the plaintiffs (See Appendix B).

The present complaint which was filed in this Court on December 2, 1969, sought an *ex parte* restraint upon the State injunction. Motion for temporary injunction was denied that day by the Honorable Edwin M. Stanley, United States District Judge. On December 5, 1969, the Fourth Circuit Court of Appeals affirmed Judge Stanley's denial, observing:

"The *ex parte* order of the state court purports to run against named individuals and 500 unnamed persons and broadly prohibits entry upon the grounds and even streets adjacent to the campus of the University of North Carolina at Chapel Hill. Despite our concern with the unusual breadth of the state court order, considerations of federalism and respect for the state courts of North Carolina compel our denial of the motion. We are influenced in our decision by the fact that the state restraining order is returnable on December 6, 1969, at which time both sides will have the opportunity to argue the merits of the matter to the state judge. Such a procedure is far better than an *ex parte* proceeding before either state or federal courts."

Counsel for the plaintiffs stated to the Court that when they arrived in Graham, North Carolina, on December 6, 1969, the date which Judge Carr first set for the show cause hearing, they found the courthouse locked.[3]

Subsequently, all criminal actions were terminated against the plaintiffs with findings of not guilty.

---

2. The parties do not stipulate to plaintiffs' conduct. Plaintiffs allege that at all times they acted in a peaceful and orderly manner in the attempt to protest racial discrimination in Chapel Hill and Orange County. Law enforcement officers of the Campus Security Force, Chapel Hill Police and North Carolina Highway Patrol state by affidavit that the plaintiffs verbally abused several officers, that one of the plaintiffs and other members of the group threatened officers with bricks, and that the group blocked paths of ingress and egress at Lenoir Hall. In the parking lot adjacent to Lenoir Hall a white student was assaulted by a group of Negroes, but there is no indication whatever that any of the plaintiffs was involved in the assault.

3. Judge Carr on December 1, 1969, had issued an Order delaying the hearing on his restraining order from December 6, 1969, to December 9, 1969. He also provided that the forum would be changed to the Courthouse at Hillsborough, North Carolina, and that the hearing and all further developments would be conducted by Judge Coy E. Brewer. The reasons for this change are not shown by the record nor were they developed at the hearing. It is known to the Court that about this time Judge Carr was physically ill and passed away a few months later. On December 9, 1969, the parties agreed to continue the injunction. It was dissolved when the action was dismissed on February 23, 1970.

## DISCUSSION

### I. ABSTENTION

Three cases, Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed. 2d 22 (1965); Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); and Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), reh. den. 391 U.S. 971, 88 S.Ct. 2029, 20 L.Ed.2d 887, give full dimension to the concept of federal review when state penal statutes are justifiably attacked on their face as abridging freedom of speech. When it is alleged that a statute is facially so vague or overbroad that its application and very existence unduly hinder rights of free speech and the statute does not reasonably appear susceptible of a limiting state court construction, abstention is improper.

> "If the rule were otherwise, the contours of regulation would have to be hammered out case by case—and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation. (Cite omitted) By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation. Moreover, we have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Dombrowski, supra*, 85 S.Ct. at 1121, 14 L.Ed.2d at 29.

Abstention also is improper when a statute, though constitutional on its face, is alleged to have been arbitrarily applied in such a manner as to accomplish the same unconstitutional result.

It is concluded that portions of the North Carolina Riot Act are not susceptible of a limiting state court construction so as to modify or avoid the federal constitutional question, making this case one in which abstention would be improper.

### II. MOOTNESS

The defendants, citing Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), claim the present question is now moot because plaintiffs have been absolved from liability under the Statute and because the "Saga" strike has been terminated.

*Golden* involved a New York Statute prohibiting the circulation of anonymous, political handbills. The plaintiff, whose state conviction was overturned on appeal by reason of state law, challenged the Statute's constitutionality in federal court. Initially, a three-judge court dismissed his claim, holding that they should abstain. In Zwickler v. Koota, *supra*, the Supreme Court reversed the "abstention" and remanded for a decision on whether the plaintiff had stated a claim coming within the definition of a *case or controversy*. The three-judge court found the issue to be alive and rendered judgment in favor of the plaintiff. Again, on appeal, this time as Golden v. Zwickler, the Supreme Court reversed, finding the question moot for reasons that the congressman, against whose campaign plaintiff distributed handbills, had been appointed to the State Supreme Court for a term of fourteen years and because the plaintiff's liability under the Statute had been removed. Although the plaintiff had alleged that he wished to pass anonymous literature in future elections, the only evidence in the record was that Zwickler's sole concern was "literature relating to the congressman and his record." It was thus wholly conjectural that another occasion would arise when he would be prosecuted for passing out the handbills referred to in his complaint. The Court said:

> "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be

possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, *under all the circumstances*, show that there is a substantial controversy, between parties having adverse legal interests, of *sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." (Emphasis added)

The facts and circumstances in *Golden* are substantially different from those we consider here. There, the Statute being questioned was narrowly drawn, clearly worded, and precise in meaning. Here, in places, the wording is so vague and fuzzy that men of ordinary understanding must necessarily guess as to its meaning and differ as to its application. Because of this, a person reading the Statute and unable to ascertain the conduct prohibited, might refrain from exercising his rights of free expression and "free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser." *Dombrowski, supra,* 85 S.Ct. at 1121, 14 L.Ed.2d at 28.

In *Golden,* the sole issue related to one man's political attack on another man. When the man being attacked was removed from the political scene, the issue withered. Here, there are plaintiffs who seek to protest issues, not a particular man nor a particular strike. The strike merely presented an opportunity to voice opinions about issues to which plaintiffs are committed. As it is alleged in the complaint:

"The plaintiffs and members of the class they represent have been and are attempting through peaceful, lawful and nonviolent means to secure equal opportunity in the fields of employment, housing, education, voting, public accommodations and services in Chapel Hill and Orange County, North Carolina; and have been and are attempting to secure the equal protection of the laws for all citizens of Chapel Hill and Orange County."

The issues here are real and continuing. They were not eradicated by settlement of the Saga Food strike. The practical likelihood of repetition lends a true sense of "immediacy and reality" to this situation.

The complaint further alleged:

"In their constant efforts to achieve these constitutionally protected goals, plaintiffs, and members of their class, have been attempting to fully and vigorously exercise rights of freedom of speech, press, assembly, association, and to petition government for a redress of grievances, which rights are secured to them under the First and Fourteenth Amendments to the United States Constitution."

The defendants in their answer allege that the plaintiffs are "engaged in going about the State fomenting strife and disruption and injesting themselves into any and all disputes, school integration troubles, strikes, and all types of revolutionary pursuits; * * *"

Professor Wright observes,

"It has been suggested by distinguished scholars that there may be a difference between a suit for a declaration about the legal consequences of past conduct and a suit in which a declaration is sought about the legal consequences of future conduct. The latter situation, it is said, is 'doubly contingent,' since the future conduct may not take place and if it does the other party may not challenge it. Of course, a court should not 'express legal opinions on academic theoreticals which might never come to pass.' But the number of contingencies that can be found in a particular situation seems largely a verbal matter, and the *practical likelihood* that the contingencies will occur and that the controversy is a real one should be decisive in determining whether an actual controversy exists." Wright, Law of Federal Courts, 1970, 447–448. (Emphasis added)

Again in *Dombrowski*,[5] the Court stated:

"But the allegations in this complaint depict a situation in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights. They suggest that a substantial loss or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination. These allegations, if true, clearly show *irreparable injury*." 85 S.Ct. p. 1120, 14 L.Ed.2d p. 28 (Emphasis added)

In Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), the petitioners sought review of an injunction prohibiting them from holding a rally. Although the injunction had expired, the Court held their claim was not moot. They had sought to continue their activities which included holding rallies, and the source of their protest—racial supremacy—remained a continuing and vital grievance.

Recently, in Korn v. Elkins, 317 F. Supp. 138 (D.Md., Sept. 17, 1970), a three-judge district court considered the constitutionality of action by the University of Maryland when it censored the picture of a burning American flag from the cover of a student publication. Although the publication had gone to press, the question was not moot. That court observed:

"The within case poses a justiciable controversy which is not rendered moot by the fact that the issue in question of Argus has been published, since there is a continuing problem in connection with future issues of Argus, and whether those issues will be permitted by the University officials to contain contents identical or similar to the excised portions of the December, 1969, issue."

Mootness is integrally a part of the concept of *case or controversy* related to standing to sue. See Evers v. Dwyer, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958). The record in this case shows circumstances of immediacy, reality, and irreparable injury such that the question should not be considered moot.

III.  MERITS

The plaintiffs have challenged this Statute as being unconstitutionally vague and overbroad. Although a Statute, clearly worded, as the one in *Golden*, might be overbroad only, i e., encompassing within its prohibitions conduct that is protected by the Constitution, a Statute that is vague must necessarily contain infirmities of overbreadth. Though distinguishable by definition, the practical effect encircles both concepts. A Statute so ineptly worded that men of common intelligence cannot agree as to what conduct is prohibited is one that particularly lends itself to a sweeping application by authorities who also must guess as to its meaning.

In United States v. Matthews, 136 U. S.App.D.C. 196, 419 F.2d 1177 (1969), Judge McGowan observed:

"The elements of that concept [vagueness] are differentiable. One is that the legislative proscription may, as a matter of rhetoric, be so fuzzy or opaque as unfairly (a) to provide the accused with inadequate advance notice of what conduct on his part will expose him to criminal sanctions, or (b) to enable the jury to convict him without itself having a very clear idea or just what he was supposed not to do. The other central aspect of the vagueness doctrine is the concern that the legislature, in seeking to make some acts illegal, will

5.  Although *Dombrowski* spoke only to the problem of abstention, the principles enunciated there must be understood to underlie the necessity of federal review when- ever a person's right of free speech is unduly obstructed by a state's penal statute.

sweep too broadly in its definitional efforts and thereby bring within its net constitutionally protected activity which, although legally immune in theory, will in fact be deterred by the prospect of criminal prosecution." At 1180.

### (A) *Riot*

Here, in examining the definitional attempts of the North Carolina legislature, the two concepts of importance are "riot" and "disorderly conduct." Riot is defined by North Carolina General Statute § 14–288.2 as a "public disturbance involving an assemblage of three or more persons which by disorderly and violent conduct, or the imminent threat of disorderly and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property." The key words are "three persons," "violent conduct," and "clear and present danger of injury or damage." These are not words so slippery and imprecise to the man of common understanding that he would have to guess at their meaning. Nor is the prohibition overbroad. "[I]t is axiomatic that violent acts are not accorded protection under the First Amendment, even though they also constitute expressive or communicative conduct." Abernathy v. Conroy, 429 F.2d 1170 (4th Cir. July 21, 1970). A public disturbance involving three or more people, no matter how noisy or boisterous, cannot, under the statutory definition, be a riot unless it also involves *violence* or the threat of immediate violence which poses a clear danger to persons or property.

It is also a crime under this subsection to "incite or urge another" to engage in a riot when as a result of such urging "a riot occurs or a clear and present danger of a riot is created."

There is no doubt that North Carolina has a vital interest in prohibiting the advocacy of *imminent* lawless action. Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). This sub-section could not reasonably be used to procure the conviction of one who merely advocates violence in futuro, but is limited in applicability to one whose actions actually result in injury or damage to persons or property or create a clear and present danger of such injury or damage.

We think North Carolina General Statute § 14–288.2 is clearly valid.

### (B) *Disorderly Conduct*

North Carolina General Statute § 14–288.4 defines "disorderly conduct" in several ways.

"Disorderly conduct is a public disturbance caused by any person who:

"(1) Engages in fighting or in violent, threatening, *or tumultuous* behavior;

"(2) Makes any *offensively coarse utterance, gesture, or display* or uses *abusive language,* in such manner as to *alarm or disturb any person present* or as to provoke a breach of the peace;

"(3) Wilfully or wantonly creates a hazardous or *physically offensive condition;* or

"(4) * * *

"(5) * * *

"(6) * * *"  (Emphasis added)

Taking the definitions in order, it becomes necessary to decide whether the series of words contained in North Carolina General Statute § 14–288.4(1) reading "[e]ngages in fighting or in violent, threatening, or tumultuous conduct" is impermissibly vague. One with less than common intelligence would understand what "fighting," and "violence" mean. "Threatening," as used within the context of the Statute quite evidently does not mean a promise of vindication to be carried out sometime in the future, but conduct portending immediate violence. "Tumult," to quote from Webster and *Abernathy,* is defined as the "[d]isorderly agitation or milling about of a crowd, usually with uproar and confusion of voices" and connotes

noisy conduct of some sort. These terms are not vague or opaque. They are, however, subject to attack as prohibiting conduct that by the First and Fourteenth Amendments is immune from regulation. Although, as mentioned earlier, a state may regulate and forbid conduct that carries the threat of imminent violence, this Statute would also regulate conduct that is noisy only. "Noisy conduct is not always a proper subject for state regulation, even if it frightens or enrages some people." *Abernathy, supra.* So far as this Statute attempts *to prohibit noisy conduct that is free from the threat of imminent violence* and does not come within an area of state interest free from conflict with the First and Fourteenth Amendments, it is overbroad.

Reading the word "tumultuous" out of North Carolina General Statute § 14–288.4(1) renders the section valid and constitutional.

Analyzing the second definition under disorderly conduct, North Carolina General Statute § 14–288.4(2), one must also consider the statutory definition of "Public Disturbance" contained in North Carolina General Statute § 14–288.1(8). Read together, the two provide that any person who commits "[a]ny annoying, disturbing, or alarming act or condition exceeding the bounds of social toleration normal for the time and place in question which occurs in a public place or which occurs in, affects persons in, or is likely to affect persons in a place to which the public or a substantial group has access" by making as provided in North Carolina General Statute § 14–288.4(2), "any offensively coarse utterance, gesture, or display or [using] abusive language, in such manner as to alarm or disturb any person present or as to provoke a breach of the peace" shall be guilty of disorderly conduct.

Exactly what constitutes "alarming" or "disturbing" conduct or what constitutes an "offensively coarse utterance" or the "bounds of social toleration" or

"gesture" or "display" or "abusive language" is more often than not a matter of pure subjectivity. What is offensive or disturbing to a member of one church or political party or race might not be so to the member of another. These are words so imprecise that men of common understanding cannot help but disagree as to their meaning. They establish no standard of guilt so that a person desiring to protest issues could read them and know with reasonable assuredness what limitations to place upon his methods and the extent of his expression.

In sweeping so definitionally broad, this provision also gathers within its ambit constitutionally protected freedoms. Not all words or conduct which offends, disturbs, incites, or provokes to resentment a number of people gathered in the same area are susceptible of regulation. Bachellar v. Maryland, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970); Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1948), reh. den. 337 U.S. 934, 69 S.Ct. 1490, 93 L.Ed. 1740; Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

> "[A] *function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.* That is why freedom of speech, though not absolute, Chaplinsky v. New Hampshire, 315 U.S. [568] 571, [572], 62 S.Ct. 766, [769,] 86 L.Ed. [1031] 1034 (1942), is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. (Cites omitted) There is no room under our Constitution for a more restrictive view. For the alter-

852

native would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups."

\* \* \* \* \* \*

"The right to speak freely and to promote diversity of ideas and programs is \* \* \* one of the chief distinctions that sets us apart from totalitarian regimes." Terminiello v. Chicago, 337 U.S. 4, 69 S.Ct. 896, 93 L. Ed. 1134.

We hold North Carolina General Statute § 14–288.4(2) unconstitutionally overbroad in violation of the First Amendment.

The third definition under this subsection, North Carolina General Statute, § 14–288.4(3), declares guilty of disorderly conduct any person who causes a public disturbance by wilfully or wantonly creating a "hazardous or physically offensive condition." The prohibiting reach of these words is also open to reasonable debate. To a person desiring the public forum for the purpose of expressing an idea or espousing a viewpoint, or to a law enforcement officer eager to maintain order and prevent public discord, it would be exceedingly difficult to determine where, in the presence of debate, argument, or anger, a "hazardous or physically offensive" condition existed. A speaker challenging tradition or offering an unpopular idea for the public's examination might be stopped or arrested because of crowd reaction that falls short "of a serious substantive evil \* \* \* [rising] far above public inconvenience, annoyance, or unrest." Because of this, persons might refrain from expressing ideas and forego their First Amendment rights.

North Carolina General Statute § 14–288.4(3) is void for vagueness and offends against the First Amendment.

North Carolina General Statute § 14–288.4(4) is clear, precise and not overbroad. Although more traditionally denominated "trespass" we do not doubt the power of the state to call it disorderly conduct and forbid it. The same may be said of North Carolina General Statute § 14–288.4(5) and (6). These sections are constitutional.

North Carolina General Statute § 14–288.5 provides among other things that if a law enforcement officer reasonably believes an assemblage of three or more persons is violating provisions of the "Disorderly Conduct" section, he may issue a command to disperse.

Since we have struck out the overbroad definitions of disorderly conduct, *supra,* we are enabled to hold it constitutional. Where there is no violence, nor imminent threat of violence, and words do not fall within that small class which are intended to provoke retaliation from a reasonable man, the officer cannot act under this subsection to disperse or arrest merely because the group becomes noisy, or because its ideas and manner of protest alarm or disturb listeners or because a "physically offensive" condition is thereby deemed to exist.

The plaintiffs have issued here a broadside attack upon most of the Riot Control Act. This Statute, as can be seen in the appendix, is not a short one. In the complaint it occupies nine and one-half legal sheets with typing single spaced. It occupies almost the same number of pages in the official publication containing North Carolina's General Statutes. The defendants contend that the plaintiffs have no standing to question provisions other than those under which they were charged. Charges were based on Sections 14–288.2, 14–288.4 and 14–288.5, the sections discussed earlier in this opinion.

The Riot Control Act of 1969 appears to have been a carefully drafted and considered piece of legislation. Facially it would seem to be constitutional, and it carries the presumption of constitutionality, as do all state statutes. But courts do not sit to render advisory opinions, and we think our decision should be limited to those parts of the statute presented to us in a factual context. Moreover, there is always the danger

that a facially constitutional statute may be applied unconstitutionally. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). In declining to pass upon the constitutionality of the statute, we do not mean to intimate any doubt as to its validity.

As to enjoining the State of North Carolina from prosecuting future cases under the statutes we have declared invalid, what was said by the court in Gregory v. Gaffney, 322 F.Supp. 238 (W.D.N.C. Jan. 20, 1971) also applies here. There is no "suggestion that the state might disregard our declaration of unconstitutionality unless enjoined." We decline therefore to issue an injunction.

### (C) *State Court Restraining Order*

In their complaint, plaintiffs asked for both preliminary and permanent injunctions restraining the State of North Carolina from enforcing the State court order prohibiting plaintiffs from going onto the campus of the University of North Carolina or its adjacent streets. Plaintiffs reason that the State restraining order is void as being overbroad and that it was issued ex parte, without notice to the plaintiffs or any of their representatives. The order in question expired February 23, 1970, when the defendants dismissed their civil action in the State court. Since the State order no longer affects plaintiffs and the order is being questioned collaterally, there is no need to discuss it at length.

As dictum, we do observe that on a writ of certiorari to the Maryland Supreme Court, the United States Supreme Court said in Carroll v. President and Commissioners of Princess Anne, *supra:*

"We need not decide the thorny problem of whether, on the facts of this case, an injunction against the announced rally could be justified. The 10-day order here must be set aside because of a basic infirmity in the procedure by which it was obtained. It was issued ex parte, without notice to petitioners and without any effort, however informal, to invite or permit their participation in the proceedings. There is a place in our jurisprudence for ex parte issuance, without notice, of temporary restraining orders of short duration; but there is no place within the area of basic freedoms guaranteed by the First Amendment for such orders where no showing is made that it is impossible to serve or to notify the opposing parties and to give them an opportunity to participate."

A Judgment consistent with this Opinion will be entered.

### JUDGMENT

For the reasons stated in the Opinion of the Court, it is ordered, adjudged and decreed:

1. That the word "tumult,"contained within the provisions of North Carolina General Statute § 14–288.4(1), as there used, is unconstitutionally overbroad.

Since the North Carolina legislature has expressly stated that the various portions of this Act be severable, Sessions Laws of North Carolina—1969, Chapter 869, § 9, p. 975, the word "tumult" is hereby severed so that North Carolina General Statute § 14–288.4(1) reads:

"(1) Engages in fighting or in violent, threatening, or tumultuous behavior; * * * *"

2. That North Carolina General Statute § 14–288.4(2) is unconstitutional and thereby invalid for reasons of vagueness and overbreadth;

3. That North Carolina General Statute § 14–288.4(3) is unconstitutional and thereby invalid for reasons of vagueness and overbreadth; and

4. That North Carolina General Statute § 14–288.5 be limited in application such that the definitions of "disorderly conduct" as it is there used do not include those declared invalid by this Judgment.

CRAVEN, Circuit Judge (concurring):

The jurisdictional question is a close one and Judge Jones' dissenting opinion is not without merit. We agree on the law and differ only as to its application to the facts—the paradigm of judicial division. But the facts involve the "firstness" of the First Amendment. With Judge Gordon, I think that in the area of freedom of speech and association there is a continuing case or controversy that is not terminated by the acquittal of these defendants in the state courts.

I do not share Judge Jones' grave concern that we have struck down parts of the statute. The few sections declared unconstitutional seem to me to be of relatively little consequence in the administration of this elaborate statute for its stated purpose of riot control.

I should think it better for all concerned, and reassuring rather than dismaying to state officers charged with the duty of enforcement, that we have reached the merits. To the extent that we have, doubt and uncertainty are resolved in favor of declared constitutionality of the heart of the statute—N.C. G.S. § 14–288.2—and other important ancillary provisions.

JONES, Chief District Judge (dissenting):

The majority labors long and hard to find that this case presents a justiciable controversy and then proceeds to strike down portions of the North Carolina statute against "riots and civil disorders", (G.S. 14–288.1 through 14–288.-19), as being unconstitutional on its face. From such conclusion and decision I must respectfully dissent.

The procedure and action taken by the majority exceeds the jurisdiction and authority of this court. I am firmly of the opinion that we should not reach the constitutional question but should dismiss this action as presenting no case or controversy within the meaning of Article III, Section 2, of the Constitution of the United States.

In the words of Chief Justice Hughes in Aetna Life Insurance Company v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617:

"The Constitution [, Article III, Section 2, limits the exercise of the judicial power to 'cases' and 'controversies'. * * * The Declaratory Judgment Act of 1934, in its limitation to 'cases of actual controversy', manifestly has regard to the constitutional provision and is operative only in respect to controversies which are such in the constitutional sense. * * * A 'controversy' in this sense must be one that is appropriate for judicial determination. Osborn v. Bank of United States, 9 Wheat 738, 819, 6 L.Ed. 204. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. United States v. Alaska S.S. Co., 253 U.S. 113, 116, 40 S.Ct. 448, 449, 64 L.Ed. 808. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. (Citations omitted). * * * It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

And then, as Chief Justice Warren said in Thorpe v. Housing Authority of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed. 2d 474:

"We do not sit, however, 'to decide abstract, hypothetical, or contingent questions * * * or to decide any constitutional question in advance of the necessity for its decision. * * *.'"

Where is the controversy in this case? The plaintiffs were found not guilty in the criminal cases and the civil action was withdrawn. More than a year has elapsed since the incidents occurred and

no new actions have been instituted against the plaintiffs. There is not a scintilla of evidence in the record to indicate any further action is contemplated. In fact, there is an inference in the record to the effect that at least part, if not all, of the plaintiffs are no longer residents of North Carolina. Then, what are "the circumstances of immediacy, reality, and irreparable injury" alleged by the plaintiffs and found by the majority which justify the action of the court in striking down portions of the statute?

The incidents giving rise to this action occurred during a labor dispute between a group of employees and their employer on the campus of the University of North Carolina at Chapel Hill. The plaintiffs were not involved in the labor dispute either as employees, employer, or the representatives of either. They were not employees, students, or members of the faculty of the University, nor were they residents of the Town of Chapel Hill or the County of Orange. They allege they came for the purpose of protesting racial discrimination and to demonstrate for certain basic civil rights, and were proceeding to do so in a lawful and orderly manner. The defendants allege that the plaintiffs came to disrupt an otherwise orderly strike and to foment strife and disruption on the campus, and that they accomplished their purpose. The only evidence in the record is the affidavits offered by the defendants, to which the plaintiffs did not reply, indicating disruptive conduct on the part of the plaintiffs.

The majority relies upon Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), and Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), to support its position on a justiciable issue being present in this case. The facts of the two cases and the case at bar are as different as night and day. *Dombrowski* dealt with the doctrine of abstention and the use of the injunctive process to prevent state prosecution in criminal cases. The

plaintiffs had been arrested, their office searched and their records seized, and while the original indictments had been quashed, the state's attorney had obtained new indictments from the Grand Jury. A real, justiciable controversy existed—not a dispute of a hypothetical or abstract character. In *Carroll*, the state court had issued an ex parte injunction prohibiting the petitioners from holding political rallies for ten days and later extended the prohibition for ten months. The appellate court of Maryland struck down the order for a ten months injunction but allowed the ten day prohibition to stand. The injunction resulted in the cancellation of at least one scheduled rally. The issues giving rise to the meetings and rallies remained unresolved and the petitioners were attempting to hold additional rallies in other parts of the state and the court order was interfering with these plans.

This case falls directly in the ambit of Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). *Zwickler* had been convicted of violating a New York statute prohibiting the circulation of anonymous literature in connection with an election campaign. His conviction was reversed on state law grounds by a New York appellate court. Shortly thereafter he instituted an action in federal court seeking declaratory and injunctive relief on the ground that, on its face, the statute was repugnant to the guarantees of free expression secured by the federal Constitution. A three-judge court abstained and the Supreme Court in Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444, reversed and remanded for a decision on whether *Zwickler* had stated a claim coming within the definition of a case or controversy. The three-judge court held that *Zwickler* had a "further and far broader right to a general adjudication of unconstitutionality * * * in his own interest as well as that of others who would with like anonymity practice free speech in a political environment." Again, upon appeal, under the title of Golden v. Zwickler, the Supreme Court

reversed finding that the question was moot since the 1966 election was over and the Congressman against whom he campaigned had been appointed to the State Supreme Court for a fourteen year term. *Zwickler* argued, as do the plaintiffs here, that he desired to exercise the First Amendment rights of free speech in other elections and against other candidates. The court found:

"We think that under all the circumstances of the case the fact that it was most unlikely that the Congressman would again be a candidate for Congress precluded a finding that there was 'sufficient immediacy and reality' here. * * * The constitutional question, First Amendment or otherwise, must be presented in the context of a specific live grievance. In United Public Workers of America (C.I.O.) v. Mitchell, [330 U.S. 75, 89,] 67 S.Ct. 556, 564 [91 L.Ed. 754] (1947), we said: 'The powers of courts, and ultimately of this Court to pass upon the constitutionality of acts of Congress arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough.' "

"The same is true of the power to pass upon the constitutionality of state statutes. No federal court, whether this Court or a district court, has 'jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies.' Liverpool, New York & P. S. S. Co. v. Commissioners [of Emigration] 113 U.S. 33, 39, 5 S.Ct. 352, 353, 28 L.Ed. 899 (1885)."

"We conclude that Zwickler did not establish the existence at the time of the hearing on the remand of the elements governing the issuance of a declaratory judgment, and therefore that the District Court should have dismissed his complaint."

The strike at Chapel Hill has long since been settled—apparently to the satisfaction of both the employees and the employer. The plaintiffs have left the scene and perhaps the State. It is most unlikely that such a dispute will erupt again. These facts preclude a finding that "circumstances of immediacy, reality, and irreparable injury" exist sufficient to make this a "live grievance."

The majority is in effect issuing an advisory opinion on an abstract question and strikes down a portion of a state statute without the existence of a substantial controversy. Federal courts should be slow to declare state statutes unconstitutional. We have been admonished by the Supreme Court on many occasions that "The cardinal principle of statutory construction is to save and not to destroy." If a statute must be destroyed, it can be done only upon a live, real, and substantial controversy. No such controversy exists here.

## APPENDIX A

### ARTICLE 36A.

#### *Riots and Civil Disorders.*

§ 14–288.1. Definitions.—Unless the context clearly requires otherwise, the definitions in this section apply throughout this article:

(1) "Chairman of the board of county commissioners": The chairman of the board of county commissioners or, in case of his absence or disability, the person authorized to act in his stead. Unless the governing body of the county has specified who is to act in lieu of the chairman with respect to a particular power or duty set out in this article, the term "chairman of the board of county commissioners" shall apply to the person generally authorized to act in lieu of the chairman.

(2) "Dangerous weapon or substance": Any deadly weapon, ammunition, explosive, incendiary device, or any instrument or substance designed for a use that car-

ries a threat of serious bodily injury or destruction of property; or any instrument or substance that is capable of being used to inflict serious bodily injury, when the circumstances indicate a probability that such instrument or substance will be so used; or any part or ingredient in any instrument or substance included above, when the circumstances indicate a probability that such part or ingredient will be so used.

(3) "Declared state of emergency": A state of emergency found and proclaimed by the Governor under the authority of § 14–288.15, by any mayor or other municipal official or officials under the authority of § 14–288.12, by any chairman of the board of commissioners of any county or other county official or officials under the authority of § 14–288.13, by any chairman of the board of county commissioners acting under the authority of § 14–288.14, by any chief executive official or acting chief executive official of any county or municipality acting under the authority of any other applicable statute or provision of the common law to preserve the public peace in a state of emergency, or by any executive official or military commanding officer of the United States or the State of North Carolina who becomes primarily responsible under applicable law for the preservation of the public peace within any part of North Carolina.

(4) "Disorderly conduct": As defined in § 14–288.4(a).

(5) "Law-enforcement officer": Any officer of the State of North Carolina or any of its political subdivisions authorized to make arrests; any other person authorized under the laws of North Carolina to make arrests and either acting within his territorial jurisdiction or in an area in which he has been lawfully called to duty by the Governor or any mayor or chairman of the board of county commissioners; any member of the armed forces of the United States, the North Carolina national guard, or the State defense militia called to duty in a state of emergency in North Carolina and made responsible for enforcing the laws of North Carolina or preserving the public peace; or any officer of the United States authorized to make arrests without warrant and assigned to duties that include preserving the public peace in North Carolina.

(6) "Mayor": The mayor or other chief executive official of a municipality or, in case of his absence or disability, the person authorized to act in his stead. Unless the governing body of the municipality has specified who is to act in lieu of the mayor with respect to a particular power or duty set out in this article, the word "mayor" shall apply to the person generally authorized to act in lieu of the mayor.

(7) "Municipality": Any active incorporated city or town, but not including any sanitary district or other municipal corporation that is not a city or town. An "active" municipality is one which has conducted the most recent election required by its charter or the general law, whichever is applicable, and which has the authority to enact general police-power ordinances.

(8) "Public disturbance": Any annoying, disturbing, or alarming act or condition exceeding the bounds of social toleration normal for the time and place in question which occurs in a public place or which occurs in, affects persons in, or is likely to affect persons in a place to which the public or a sub-

stantial group has access. The places covered by this definition shall include, but not be limited to, highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood.

(9) "Riot": As defined in § 14–288.2 (a).

(10) "State of emergency": The condition that exists whenever, during times of public crisis, disaster, rioting, catastrophe, or similar public emergency, public safety authorities are unable to maintain public order or afford adequate protection for lives or property, or whenever the occurrence of any such condition is imminent. (1969, c. 869, s. 1.)

§ 14–288.2. Riot; inciting to riot; punishments.—(a) A riot is a public disturbance involving an assemblage of three or more persons which by disorderly and violent conduct, or the imminent threat of disorderly and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property.

(b) Any person who wilfully engages in a riot is guilty of a misdemeanor punishable as provided in § 14–3 (a).

(c) Any person who wilfully engages in a riot is guilty of a felony punishable by a fine not to exceed ten thousand dollars ($10,000.00) or imprisonment for not more than five years, or both such fine and imprisonment, if:

(1) In the course and as a result of the riot there is property damage in excess of fifteen hundred dollars ($1,500.00) or serious bodily injury; or

(2) Such participant in the riot has in his possession any dangerous weapon or substance.

(d) Any person who wilfully incites or urges another to engage in a riot, so that as a result of such inciting or urging a riot occurs or a clear and present danger of a riot is created, is guilty of a misdemeanor punishable as provided in § 14–3(a).

(e) Any person who wilfully incites or urges another to engage in a riot, and such inciting or urging is a contributing cause of a riot in which there is property damage in excess of fifteen hundred dollars ($1,500.00) or serious bodily injury, is guilty of a felony punishable as provided in § 14–2. (1969, c. 869, s. 1.)

§ 14–288.3. Provisions of article intended to supplement common law and other statutes.—The provisions of this article are intended to supersede and extend the coverage of the common-law crimes of riot and inciting to riot. To the extent that such common-law offenses may embrace situations not covered under the provisions of this article, however, criminal prosecutions may be brought for such crimes under the common law. All other provisions of this article are intended to be supplementary and additional to the common law and other statutes of this State and, except as specifically indicated, shall not be construed to abrogate, abolish, or supplant other provisions of law. In particular, this article shall not be deemed to abrogate, abolish, or supplant such common-law offenses as unlawful assembly, rout, conspiracy to commit riot or other criminal offenses, false imprisonment, and going about armed to the terror of the populace and other comparable public-nuisance offenses. (1969, c. 869, s. 1.)

§ 14–288.4. Disorderly conduct.—(a) Disorderly conduct is a public disturbance caused by any person who:

(1) Engages in fighting or in violent, threatening or tumultuous behavior; or

(2) Makes any offensively coarse utterance, gesture, or display or uses abusive language, in such manner as to alarm or disturb any person present or as to provoke a breach of the peace; or

(3) Wilfully or wantonly creates a hazardous or physically offensive condition; or

(4) Takes possession of, exercises control over, seizes, or occupies any building or facility of any public or private educational institution without the specific authority of the chief administrative officer of the institution, or his authorized representative; or

(5) Refuses to vacate any building or facility of any public or private educational institution in obedience to:

a. An order of the chief administrative officer of the institution, or his authorized representative; or

b. An order given by any fireman or public health officer acting within the scope of his authority; or

c. If a state of emergency is occurring or is imminent within the institution, an order given by any law-enforcement officer acting within the scope of his authority; or

(6) Shall, after being forbidden to do so by the chief administrative officer, or his authorized representative, of any public or private educational institution:

a. Engage in any sitting, kneeling, lying down, or inclining so as to obstruct the ingress or egress of any person entitled to the use of any building or facility of the institution in its normal and intended use; or

b. Congregate, assemble, form groups or formations (whether organized or not), block, or in any manner otherwise interfere with the operation or functioning of any building or facility of the institution so as to interfere with the customary or normal use of the building or facility.

As used in this section the term "building or facility" includes the surrounding grounds and premises of any building or facility used in connection with the operation or functioning of such building or facility.

(b) Any person who wilfully engages in disorderly conduct is guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars ($500.00) or imprisonment for not more than six months. (1969, c. 869, s. 1.)

§ 14-288.5. Failure to disperse when commanded, misdemeanor; prima facie evidence.—(a) Any law-enforcement officer or public official responsible for keeping the peace may issue a command to disperse in accordance with this section if he reasonably believes that a riot, or disorderly conduct by an assemblage of three or more persons, is occurring. The command to disperse shall be given in a manner reasonably calculated to be communicated to the assemblage.

(b) Any person who fails to comply with a lawful command to disperse is guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars ($500.00) or imprisonment for not more than six months.

(c) If any person remains at the scene of any riot, or disorderly conduct by an assemblage of three or more persons, following a command to disperse and after a reasonable time for dispersal has elapsed, it is prima facie evidence that the person so remaining is wilfully engaging in the riot or disorderly conduct, as the case may be. (1969, c. 869, s. 1.)

§ 14-288.6. Looting; trespass during emergency.—(a) Any person who enters upon the premises of another without legal justification when the usual security of property is not effective due to the occurrence or aftermath of riot, insurrection, invasion, storm, fire, explosion, flood, collapse, or other disaster or calamity is guilty of the misdemeanor of trespass during emergency and is punishable as provided in § 14-3 (a).

(b) Any person who commits the crime of trespass during emergency and, without legal justification, obtains or exerts control over, damages, ransacks, or

destroys the property of another is guilty of the felony of looting and is punishable by a fine not to exceed ten thousand dollars ($10,000.00) or imprisonment for not more than five years, or both such fine and imprisonment. (1969, c. 869, s. 1.)

§ 14-288.7. Transporting dangerous weapon or substance during emergency; possessing off premises; exceptions.— (a) Except as otherwise provided in this section, it is unlawful for any person to transport or possess off his own premises any dangerous weapon or substance in any area:

(1) In which a declared state of emergency exists; or

(2) Within the immediate vicinity of which a riot is occurring.

(b) This section does not apply to persons exempted from the provisions of § 14-269 with respect to any activities lawfully engaged in while carrying out their duties.

(c) Any person who violates any provision of this section is guilty of a misdemeanor punishable as provided in § 14-3(a). (1969, c. 869, s. 1.)

§ 14-288.8 Manufacture, assembly, possession, storage, transportation, sale, purchase, delivery, or acquisition of weapon of mass death and destruction; exceptions.—(a) Except as otherwise provided in this section, it is unlawful for any person to manufacture, assemble, possess, store, transport, sell, offer to sell, purchase, offer to purchase, deliver or give to another, or acquire any weapon of mass death and destruction.

(b) This section does not apply to:

(1) Persons exempted from the provisions of § 14-269 with respect to any activities lawfully engaged in while carrying out their duties.

(2) Importers, manufacturers, dealers, and collectors of firearms, ammunition, or destructive devices validly licensed under the laws of the United States or the State of North Carolina, while lawfully engaged in activities authorized under their licenses.

(3) Persons under contract with the United States, the State of North Carolina, or any agency of either government, with respect to any activities lawfully engaged in under their contracts.

(4) Inventors, designers, ordnance consultants and researchers, chemists, physicists, and other persons lawfully engaged in pursuits designed to enlarge knowledge or to facilitate the creation, development, or manufacture of weapons of mass death and destruction intended for use in a manner consistent with the laws of the United States and the State of North Carolina.

(c) The term "weapon of mass death and destruction" includes:

(1) Any explosive, incendiary, or poison gas:

a. Bomb; or

b. Grenade; or

c. Rocket having a propellant charge of more than four ounces; or

d. Missile having an explosive or incendiary charge of more than one-quarter ounce; or

e. Mine; or

f. Device similar to any of the devices described above; or

(2) Any type of weapon (other than a shotgun or a shotgun shell of a type particularly suitable for sporting purposes) which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; or

(3) Any machine gun, sawed-off shotgun, or other weapon designed for rapid fire or inflicting widely dispersed injury or damage (other

than a weapon of a type particularly suitable for sporting purposes); or

(4) Any combination of parts either designed or intended for use in converting any device into any weapon described above and from which a weapon of mass death and destruction may readily be assembled.

The term "weapon of mass death and destruction" does not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line-throwing, safety, or similar device; surplus ordnance sold, loaned or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of Title 10 of the United States Code; or any other device which the Secretary of the Treasury finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting purposes, in accordance with chapter 44 of Title 18 of the United States Code.

(d) Any person who violates any provision of this section is guilty of a misdemeanor punishable as provided in § 14-3(a). (1969, c. 869, s. 1.)

§ 14-288.9. Assault on emergency personnel; punishments.—(a) An assault upon emergency personnel is an assault upon any person coming within the definition of "emergency personnel" which is committed in an area:

(1) In which a declared state of emergency exists; or

(2) Within the immediate vicinity of which a riot is occurring or is imminent.

(b) The term "emergency personnel" includes law-enforcement officers, firemen, ambulance attendants, utility workers, doctors, nurses, and other persons lawfully engaged in providing essential services during the emergency.

(c) Any person who commits an assault upon emergency personnel is guilty of a misdemeanor punishable as provided in § 14-3(a). Any person who commits an assault upon emergency personnel with or through the use of any dangerous weapon or substance is guilty of a felony punishable by a fine not to exceed ten thousand dollars ($10,000.00) or imprisonment for not more than five years, or both such fine and imprisonment. (1969, c. 869, s. 1.)

§ 14-288.10. Frisk of persons during violent disorders; frisk of curfew violators.—(a) Any law-enforcement officer may frisk any person in order to discover any dangerous weapon or substance when he has reasonable grounds to believe that the person is or may become unlawfully involved in an existing riot and when the person is close enough to such riot that he could become immediately involved in the riot. The officer may also at that time inspect for the same purpose the contents of any personal belongings that the person has in his possession.

(b) Any law-enforcement officer may frisk any person he finds violating the provisions of a curfew proclaimed under the authority of §§ 14-288.12, 14-288.13, 14-288.14, or 14-288.15 or any other applicable statutes or provisions of the common law in order to discover whether the person possesses any dangerous weapon or substance. The officer may also at that time inspect for the same purpose the contents of any personal belongings that the person has in his possession. (1969, c. 869, s. 1.)

§ 14-288.11. Warrants to inspect vehicles in riot areas or approaching municipalities during emergencies.—(a) Notwithstanding the provisions of article 4 of chapter 15, any law-enforcement officer may, under the condition specified in this section, obtain a warrant authorizing inspection of vehicles under the conditions and for the purpose specified in subsection (b).

(b) The inspection shall be for the purpose of discovering any dangerous

weapon or substance likely to be used by one who is or may become unlawfully involved in a riot. The warrant may be sought to inspect:

(1) All vehicles entering or approaching a municipality in which a state of emergency exists; or

(2) All vehicles which might reasonably be regarded as being within or approaching the immediate vicinity of an existing riot.

(c) The warrant may be issued by any judge or justice of the General Court of Justice.

(d) The issuing official shall issue the warrant only when he has determined that the one seeking the warrant has been specifically authorized to do so by the head of the law-enforcement agency of which the affiant is a member, and:

(1) If the warrant is being sought for the inspection of vehicles entering or approaching a municipality, that a state of emergency exists within the municipality; or

(2) If the warrant being sought is for the inspection of vehicles within or approaching the immediate vicinity of a riot, that a riot is occurring within that area.

Facts indicating the basis of these determinations must be stated in an affidavit and signed by the affiant under oath or affirmation.

(e) The warrant must be signed by the issuing official and must bear the hour and date of its issuance.

(f) The warrant must indicate whether it is for the inspection of vehicles entering or approaching a municipality or whether it is for the inspection of vehicles within or approaching the immediate vicinity of a riot. In either case, it must also specify with reasonable precision the area within which it may be exercised.

(g) The warrant shall become invalid twenty-four hours following its issuance and must bear a notation to that effect.

(h) Warrants authorized under this section shall not be regarded as search warrants for the purposes of application of article 4 of chapter 15.

(i) Nothing in this section is intended to prevent warrantless frisks, searches, and inspections to the extent that they may be constitutional and consistent with common law and governing statutes. (1969, c. 869, s. 1.)

§ 14-288.12 Powers of municipalities to enact ordinances to deal with states of emergency.—(a) The governing body of any municipality may enact ordinances designed to permit the imposition of prohibitions and restrictions during a state of emergency.

(b) The ordinances authorized by this section may permit prohibitions and restrictions:

(1) Of movements of people in public places;

(2) Of the operation of offices, business establishments, and other places to or from which people may travel or at which they may congregate;

(3) Upon the possession, transportation, sale, purchase, and consumption of intoxicating liquors;

(4) Upon the possession, transportation, sale, purchase, storage, and use of dangerous weapons and substances, and gasoline; and

(5) Upon other activities or conditions the control of which may be reasonably necessary to maintain order and protect lives or property during the state of emergency.

The ordinances may delegate to the mayor of the municipality the authority to determine and proclaim the existence of a state of emergency, and to impose those authorized prohibitions and restrictions appropriate at a particular time.

(c) This section is intended to supplement and confirm the powers conferred by §§ 160-52, 160-200(7), and all other general and local laws authorizing municipalities to enact ordinances for the

protection of the public health and safety in times of riot or other grave civil disturbance or emergency.

(d) Any ordinance of a type authorized by this section promulgated prior to June 19, 1969 shall, if otherwise valid, continue in full force and effect without reenactment.

(e) Any person who violates any provision of an ordinance or a proclamation enacted or proclaimed under the authority of this section is guilty of a misdemeanor punishable as provided in § 14-4. (1969, c. 869, s. 1.)

§ 14-288.13. Powers of counties to enact ordinances to deal with states of emergency.—(a) The governing body of any county may enact ordinances designed to permit the imposition of prohibitions and restrictions during a state of emergency.

(b) The ordinances authorized by this section may permit the same prohibitions and restrictions to be imposed as enumerated in § 14-288.12(b). The ordinances may delegate to the chairman of the board of county commissioners the authority to determine and proclaim the existence of a state of emergency, and to impose those authorized prohibitions and restrictions appropriate at a particular time.

(c) No ordinance enacted by a county under the authority of this section shall apply within the corporate limits of any municipality, or within any area of the county over which the municipality has jurisdiction to enact general police-power ordinances, unless the municipality by resolution consents to its application.

(d) Any person who violates any provision of an ordinance or a proclamation enacted or proclaimed under the authority of this section is guilty of a misdemeanor punishable as provided in § 14-4. (1969, c. 869, s. 1.)

§ 14-288.14. Power of chairman of board of county commissioners to extend emergency restrictions imposed in municipality.—(a) The chairman of the board of commissioners of any county who has been requested to do so by a mayor may by proclamation extend the effect of any one or more of the prohibitions and restrictions imposed in that mayor's municipality pursuant to the authority granted in § 14-288.12. The chairman may extend such prohibitions and restrictions to any area within his county in which he determines it to be necessary to assist in controlling the state of emergency within the municipality. No prohibition or restriction extended by proclamation by the chairman under the authority of this section shall apply within the limits of any other municipality, or within any area of the county over which the municipality has jurisdiction to enact general police-power ordinances, unless that other municipality by resolution consents to its application.

(b) Whenever any chairman of the board of county commissioners extends the effect of municipal prohibitions and restrictions under the authority of this section to any area of the county, it shall be deemed that a state of emergency has been validly found and declared with respect to such area of the county.

(c) Any chairman of a board of county commissioners extending prohibitions and restrictions under the authority of this section must take reasonable steps to give notice of its terms to those likely to be affected. The chairman of the board of commissioners shall proclaim the termination of any prohibitions and restrictions extended under the authority of this section upon:

(1) His determination that they are no longer necessary; or

(2) The determination of the board of county commissioners that they are no longer necessary; or

(3) The termination of the prohibitions and restrictions within the municipality.

(d) The powers authorized under this section may be exercised whether or not the county has enacted ordinances under the authority of § 14-288.13. Exercise of this authority shall not preclude the imposition of prohibitions and restric-

tions under any ordinances enacted by the county under the authority of § 14–288.13.

(e) Any person who violates any provision of any prohibition or restriction extended by proclamation under the authority of this section is guilty of a misdemeanor punishable by a fine not to exceed fifty dollars ($50.00) or imprisonment for not more than thirty days. (1969, c. 869, s. 1.)

§ 14–288.15. Authority of Governor to exercise control in emergencies.— (a) When the Governor determines that a state of emergency exists in any part of North Carolina, he may exercise the powers conferred by this section if he further finds that local control of the emergency is insufficient to assure adequate protection for lives and property.

(b) Local control shall be deemed insufficient only if:

(1) Needed control cannot be imposed locally because local authorities responsible for preservation of the public peace have not enacted appropriate ordinances or issued appropriate proclamations as authorized by §§ 14–288.12, 14–288.13, or 14–288.14; or

(2) Local authorities have not taken implementing steps under such ordinances or proclamations, if enacted or proclaimed, for effectual control of the emergency that has arisen; or

(3) The area in which the state of emergency exists has spread across local jurisdictional boundaries and the legal control measures of the jurisdictions are conflicting or uncoordinated to the extent that efforts to protect life and property are, or unquestionably will be, severely hampered; or

(4) The scale of the emergency is so great that it exceeds the capability of local authorities to cope with it.

(c) The Governor when acting under the authority of this section may:

(1) By proclamation impose prohibitions and restrictions in all areas affected by the state of emergency; and

(2) Give to all participating State and local agencies and officers such directions as may be necessary to assure coordination among them. These directions may include the designation of the officer or agency responsible for directing and controlling the participation of all public agencies and officers in the emergency. The Governor may make this designation in any manner which, in his discretion, seems most likely to be effective. Any law-enforcement officer participating in the control of a state of emergency in which the Governor is exercising control under this section shall have the same power and authority as a sheriff throughout the territory to which he is assigned.

(d) The Governor in his discretion, as appropriate to deal with the emergency then occurring or likely to occur, may impose any one or more or all of the types of prohibitions and restrictions enumerated in § 14–288.12(b), and may amend or rescind any prohibitions and restrictions imposed by local authorities.

(e) Any person who violates any provision of a proclamation of the Governor issued under the authority of this section is guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars ($500.00) or imprisonment for not more than six months. (1969, c. 869, s. 1.)

§ 14–288.16. Effective time, publication, amendment, and recision of proclamations.—(a) This section applies to proclamations issued under the authority of §§ 14–288.12, 14–288.13, 14–288.14, and 14–288.15, and any other applicable statutes and provisions of the common law.

(b) All prohibitions and restrictions imposed by proclamation shall take effect immediately upon publication of the

proclamation in the area affected unless the proclamation sets a later time. For the purpose of requiring compliance, publication may consist of reports of the substance of the prohibitions and restrictions in the mass communications media serving the affected area or other effective methods of disseminating the necessary information quickly. As soon as practicable, however, appropriate distribution of the full text of any proclamation shall be made. This subsection shall not be governed by the provisions of § 1–597.

(c) Prohibitions and restrictions may be extended as to time or area, amended, or rescinded by proclamation. Prohibitions and restrictions imposed by proclamation under the authority of §§ 14–288.-12, 14–288.13, and 14–288.14 shall expire five days after their last imposition unless sooner terminated under § 14–288.-14(c) (3), by proclamation, or by the governing body of the county or municipality in question. Prohibitions and restrictions imposed by proclamation of the Governor shall expire five days after their last imposition unless sooner terminated by proclamation of the Governor. (1969, c. 869, s. 1.)

§ 14–288.17. Municipal and county ordinances may be made immediately effective if state of emergency exists or is imminent.—(a) Notwithstanging (sic) any other provision of law, whether general or special, relating to the promulgation or publication of ordinances by any municipality or county, this section shall control with respect to any ordinances authorized by §§ 14–288.11 and 14–288.-12.

(b) Upon proclamation by the mayor or chairman of the board of county commissioners that a state of emergency exists within the municipality or the county, or is imminent, any ordinance enacted under the authority of this article shall take effect immediately unless the ordinance sets a later time. If the effect of this section is to cause an ordinance to go into effect sooner than it otherwise could under the law applicable to the municipality or county, the mayor or chairman of the board of county commissioners, as the case may be, shall take steps to cause reports of the substance of any such ordinance to be disseminated in a fashion that such substance will likely be communicated to the public in general, or to those who may be particularly affected by the ordinance if it does not affect the public generally. As soon as practicable thereafter, appropriate distribution or publication of the full text of any such ordinance shall be made. (1969, c. 869, s. 1.)

§ 14–288.18. Injunction to cope with emergencies at public and private educational institutions.—(a) The chief administrative officer, or his authorized representative, of any public or private educational institution may apply to any superior court judge for injunctive relief if a state of emergency exists or is imminent within his institution. For the purposes of this section, the superintendent of any city or county administrative school unit shall be deemed the chief administrative officer of any public elementary or secondary school within his unit.

(b) Upon a finding by a superior court judge, to whom application has been made under the provisions of this section, that a state of emergency exists or is imminent within a public or private educational institution by reason of riot, disorderly conduct by three or more persons, or the imminent threat of riot, the judge may issue an injunction containing provisions appropriate to cope with the emergency then occurring or threatening. The injunction may be addressed to named persons or named or described groups of persons as to whom there is satisfactory cause for believing that they are contributing to the existing or imminent state of emergency, and ordering such persons or groups of persons to take or refrain or desist from taking such various actions as the judge finds it appropriate to include in his order. (1969, c. 869, s. 1.)

§ 14–288.19. Governor's power to order evacuation of public building.—(a)

When it is determined by the Governor that a great public crisis, disaster, riot, catastrophe, or any other similar public emergency exists, or the occurrence of any such condition is imminent, and, in the Governor's opinion it is necessary to evacuate any building owned or controlled by any department, agency, institution, school, college, board, division, commission or subdivision of the State in order to maintain public order and safety or to afford adequate protection for lives or property, the Governor is hereby authorized to issue an order of evacuation directing all persons within the building to leave the building and its premises forthwith. The order shall be delivered to any law-enforcement officer or officer of the national guard, and such officer shall, by a suitable public address system, read the order to the occupants of the building and demand that the occupants forthwith evacuate said building within the time specified in the Governor's order.

(b) Any person who wilfully refuses to leave the building as directed in the Governor's order shall be guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars ($500.00) or imprisonment for not more than six months, or both, in the discretion of the court. (1969, c. 1129.)

## SUBCHAPTER XI. GENERAL POLICE REGULATIONS.

## ARTICLE 37.

### Lotteries and Gaming.

§ 14-289. Advertising lotteries.—If anyone, by writing or printing or by circular or letter or in any other way, advertise or publish an account of a lottery, whether within or without this State, stating how, when or where the same is to be or has been drawn, or what are the prizes therein or any of them, or the price of a ticket or any share or interest therein, or where or how it may be obtained, he shall be guilty of a misdemeanor. (1887, c. 211; Rev., s. 3725; C.S., s. 4427.)

Editor's Note.—See the discussion in 5 N.C.L.Rev. 31.

§ 14-290. Dealing in lotteries.—If any person shall open, set on foot, carry on, promote, make or draw, publicly or privately, a lottery, by whatever name, style or title the same may be denominated or known; or if any person shall, by such way and means, expose or set to sale any house, real estate, goods.

## APPENDIX B

## IN THE SUPERIOR COURT

## NORTH CAROLINA

## ORANGE COUNTY

William Clyde Friday, as President of the Consolidated University of North Carolina; J. Carlyle Sitterson, as Chancellor of the University of North Carolina at Chapel Hill,

Plaintiff

vs

Howard Fuller;
George Vlasits;
James Lee;
Preston Dobbins;
Thomas Jefferson Greyson;
Anthony Martin Behcler;
Doe One to Doe Five Hundred (inclusive, and all intervening numbers as though each such Doe were separately and severally designated).

Defendants

## ORDER

This cause coming on to be heard before His Honor Leo Carr, Resident Superior Court Judge of the Fifteenth Judicial District; and it appearing to the Court from the verified Complaint of the Plaintiffs in this action used as an Affidavit, that the operation of the University of North Carolina at Chapel Hill has been disrupted and that civil disorders have ensued from the conduct of

the Defendants set forth in the Complaint, and that the continued peaceful operation of the University of North Carolina at Chapel Hill has been placed in peril; and that a state of emergency within the meaning of North Carolina G.S. § 14–288.18 is imminent at the campus of the University of North Carolina at Chapel Hill;

It is therefore, ordered, adjudged and decreed that the named Defendants, and each of them and all persons acting in concert with them or under their direction or under the directions of any of them to whom notice and knowledge of this Order may come, and until further orders of the Court be hereby enjoined and restrained as follows:

I. From interfering with, obstructing, disrupting or attempting to obstruct or disrupt the normal operations of the University of North Carolina at Chapel Hill in any manner or form, including but not limited to the manner hereinafter set forth.

II. From assaulting, threatening, abusing, or intimidating any student, faculty member, staff member or officer of the University of North Carolina at Chapel Hill, police officer, public officials, or any other person or persons, lawfully on the campus of the University of North Carolina at Chapel Hill.

III. From going onto the grounds of or into the buildings of administrative offices or any other property of the University of North Carolina at Chapel Hill, or any street immediately adjacent to or within the confines of the campus until the current strike referred to in Paragraph X of the complaint in this cause is ended.

IV. From using any vile, abusive, violent or threatening language at or towards any person on the campus of the University of North Carolina at Chapel Hill, or towards any person or persons entering or leaving the campus of the University of North Carolina at Chapel Hill.

V. From interfering with or impeding in any manner any car, truck, or motor vehicle or any other type of vehicle, while approaching or leaving the campus of the University of North Carolina at Chapel Hill, and from any manner interfering with the ingress or egress of any person or persons or vehicle from the grounds, property or buildings belonging to the University of North Carolina at Chapel Hill, or along or over any of the streets or roads immediately adjacent thereto.

VI. From counseling, procuring, commanding, aiding or abetting any person or persons from doing any of the foregoing acts or causing them to be done.

This Order shall be effective forthwith.

It is further ordered and decreed that the Sheriff of Orange County or any other legally constituted law enforcement officer, shall immediately cause copies of this Order to be posted at conspicuous places on the campus of the University of North Carolina at Chapel Hill, and at the Municipal Building of the City of Chapel Hill, and that copies of this Order be released to the representatives of the press, radio, and television, and that all persons having knowledge thereof shall be bound hereby.

It is further ordered and adjudged that the Defendants appear before Judge Leo Carr, Judge of the Superior Court, in Chambers in the Superior Court Room in the Court House in Graham, North Carolina on Saturday, the 6th day of December, 1969, at 10 o'clock a. m., and show cause if any there be why this Order should not be continued until the final determination of this action.

This, the 26th day of November, 1969.

s/Leo Carr
_____
Judge of the Superior Court